## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**CARLOS A. MONTANEZ,**

      **Plaintiff,**

**v.**

                                       **Case No. 15-cv-1397-NJR-MAB**

**DR. JOHN TROST,**
**WEXFORD HEALTH SOURCES, INC.,**
**and DR. STEPHEN RITZ,**

      **Defendants.**

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on an Amended Report and Recommendation of United States Magistrate Judge Mark A. Beatty (Doc. 202), which recommends that the Motion for Summary Judgment filed by Defendants Dr. Stephen Ritz, and Wexford Health Sources, Inc. (Doc. 174) be granted in part and denied in part. The Amended Report and Recommendation was entered on May 22, 2019 (Doc. 202). On May 31, 2019, Montanez filed an objection (Doc. 206). On June 4, 2019, Dr. Ritz filed an objection (Doc. 215). That same day, Wexford filed a response to Montanez's objection (Doc. 216). For the reasons set forth below, the Court adopts the Report and Recommendation.

### BACKGROUND

Montanez, an inmate of the Illinois Department of Corrections, complains of conduct that took place while he was incarcerated at Menard Correctional Center. Montanez alleges that he was assaulted by an inmate at Menard and then taken to a local hospital until he was

transferred to Barnes-Jewish Hospital in St. Louis, Missouri ("Barnes") for treatment. While at Barnes, medical personnel diagnosed Montanez with multiple fractures on the right side of his face (Doc. 145-5, p. 9). On October 8, 2015, Montanez was discharged from Barnes with a recommendation to consult Ophthalmology for "possible blunt trauma to the globe." (Doc. 140-1, p. 2). He was also discharged with instructions to have a CT scan to diagnose further injuries and make follow-up appointments to be seen by the Ophthalmology Clinic at Barnes within two to three weeks and the Plastic Surgery Clinic at Barnes within one week (Doc. 145-5, p. 15).

Following his discharge on October 8th, Montanez was transferred to Menard's Health Care Unit ("HCU"), where Dr. Trost assumed responsibility for his care (Doc. 145-3, p. 8). On October 14, 2015, Dr. Hager, a medical professional at Menard, evaluated Montanez and agreed with the recommendation from Barnes that Montanez needed follow-up care (*Id.* at p. 15; Doc. 180-1). Montanez also reported experiencing blurry vision, pain, nausea, difficulty with eye movement, and double and quadruple vision ("diplopia") (Docs. 140-2, 140-3, 140-5). Dr. Trost then recommended that Montanez be seen by an ophthalmologist and Dr. Ritz, a physician working for Wexford Health Sources, Inc. ("Wexford"), approved the recommendation (Docs. 140-2, 140-3, 140-4).

On November 5, 2015, Menard personnel scheduled an appointment for Montanez to be seen by Dr. Mark Nekola, an ophthalmologist with Quantum Vision, on November 24, 2015 (Doc. 140-2). Dr. Nekola evaluated Montanez and provided the following assessment: "Mr. Montanez gives conflicting symptoms but I do think he has an orbital floor fracture on the left side. There is no restriction to movement on exam. That said I would have an ENT

take a look at x rays/scans to decide if it needs repair." (*Id.* at p. 13).

On November 25, 2015, in accordance with Dr. Nekola's recommendation, Dr. Trost wrote a request for Montanez to be seen by an ENT, and the request was approved by Dr. Ritz (Doc. 140-2). The ENT declined to see Montanez, however, and recommended that he be seen by a plastic surgeon instead (Doc. 140-3, p. 5; Doc. 140-5).

On December 7, 2015, Menard medical personnel scheduled an appointment with Plastic Surgery Consultants for Montanez to be evaluated on December 17, 2015 (Doc. 140-2). Dr. Richard Hehmann, a plastic surgeon employed at Plastic Surgery Consultants, evaluated Montanez and recommended that he be seen by an oculoplastic surgeon to determine whether his double vision would benefit from surgery (Doc. 140-7).

Dr. Trost then requested a referral for an outside specialist, which Dr. Ritz approved on January 6, 2016 (Doc. 140-2). Menard's scheduling office had difficulty scheduling the appointment because outside providers refused to treat Montanez (Doc. 140-2, p. 16). Dr. Trost again requested a referral for an outside specialist, which Dr. Ritz approved on January 15; the Menard scheduling office then made an appointment for Montanez to be seen by an ophthalmologist (*Id.*).

On February 1, an ophthalmologist evaluated Montanez, noted that he was experiencing diplopia in all directions except with his straight forward gaze, and suggested that he "would not pursue surgical correction." (*Id.* at p. 29). On March 17, in accordance with that recommendation, Dr. Couch, an oculoplastic surgeon, evaluated Montanez and concluded that he has "no limitation in eye movement in the medial and lateral gaze . . . I do not see signs or symptoms to suggest that the diplopia has been caused by fracture." (*Id.* at

p. 31). Dr. Couch then recommended a "repeat of a CT scan of his orbits and return to discuss this further in the near future." (Doc. 145-7, p. 3).

In April 2016, Montanez fell when climbing down from the top bunk, and he alleges this was due to his double vision (Doc. 145-7). After the fall, Menard medical personnel evaluated Montanez for his shoulder pain and provided him with pain medication (Doc. 140-2). On May 26, Dr. Trost evaluated Montanez and recommended physical therapy (*Id*.). Dr. Ritz approved physical therapy and, in July 2016, medical personnel from the Southern Illinois Health Care Rehabilitation Institute of Chicago treated Montanez (*Id*.). In August, Montanez started to refuse physical therapy sessions because he believed that it was not helping his shoulder (*Id*.). On October 13, Montanez met with an optometrist to obtain new glasses to help address his vision issues, but the optometrist noted in his report that Montanez "refuses new gls litigation @ menard . . . ." (Doc. 140-8).

### THE REPORT AND RECOMMENDATION

Judge Beatty recommends denying the motion for summary judgment as to Dr. Ritz because a reasonable jury could find that Dr. Ritz consciously disregarded the risks associated with delaying Montanez's follow-up with a plastic surgeon. Specifically, Judge Beatty found that there were issues of fact as to whether: (1) Dr. Ritz knew of Barnes's recommendation that Montanez see a plastic surgeon for follow-up within one week of his discharge; and (2) Dr. Ritz should have modified Dr. Trost's initial recommendation to include an off-site medical referral for Montanez to visit a plastic surgeon.

Judge Beatty recommends granting the motion for summary judgment as to Wexford because Montanez fails to present evidence to support any type of causal link or connection

between the alleged policy and claimed constitutional violation. As to Montanez's claim that Wexford maintained a practice of condoning employee misconduct despite knowing it delayed treatments, Judge Beatty found that this policy has no bearing on whether Dr. Trost's failure to follow Barnes's specific recommendation ultimately amounts to deliberate indifference. As to Montanez's claim that Wexford maintained a practice of hiring underqualified medical directors despite knowing it caused significant delays, Judge Beatty found that this has no bearing on whether Dr. Trost's failure to follow Barnes's specific recommendation amounts to deliberate indifference.

## DISCUSSION

The parties have filed timely objections to the Report and Recommendation as to the motion for summary judgment. When timely objections are filed, the Court must undertake a *de novo* review of the Report and Recommendation. 28 U.S.C. § 636(b)(1)(B), (C); FED. R. CIV. P. 72(b); SDIL-LR 73.1(b); *Harper v. City of Chicago Heights*, 824 F. Supp. 786, 788 (N.D. Ill. 1993); *see also Govas v. Chalmers*, 965 F.2d 298, 301 (7th Cir. 1992). This requires the Court to look at all evidence contained in the record and give fresh consideration to those issues to which specific objections have been made and make a decision "based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Harper*, 824 F.Supp. at 788 (citing 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3076.8, at p. 55 (1st ed. 1973) (1992 Pocket Part)); *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). The Court may then "accept, reject or modify the magistrate judge's recommended

decision." *Harper,* 824 F. Supp. at 788.

## I.    Dr. Ritz

First, Dr. Ritz objects to Judge Beatty's conclusion that there is a material issue of fact regarding whether Dr. Ritz was deliberately indifferent to Montanez's serious medical need.[1] Judge Beatty concluded that there is an issue of fact as to whether Dr. Ritz knew of the recommendation from Barnes for Montanez to see a plastic surgeon for follow-up within a week of his discharge. Judge Beatty further concluded that there is a discrepancy in what Dr. Ritz's role in the collegial review process entails, thus there is an issue of fact as to whether he should have modified Dr. Trost's initial referral request.

Dr. Ritz argues that there is no evidence that he was aware of the recommendations by Barnes. Further, Dr. Ritz argues that Judge Beatty erroneously "utilize[d] Dr. Ritz's testimony regarding his thought process for altering a referral in a different case to recommend denying Dr. Ritz's motion in this case." (Doc. 215, p. 3). Dr. Ritz cites to his deposition testimony where he explained that his role "is not to oversee and . . . challenge . . . or modify the medical care provided to the patients that come to collegial." (Doc. 175-2, p. 18).

Here, the Court finds that there is an issue of fact as to whether Dr. Ritz had knowledge of the recommendations suggested by Barnes. Dr. Ritz testified that, when he participates in the collegial review process, he looks at the "relevant history and information that's submitted to [him] by the site." (Doc. 189-10, p. 19). A jury could certainly find that the Barnes medical recommendations would have been considered "relevant history" pertaining

---

[1] The parties do not dispute that Montanez suffered a serious medical need, so the issue is whether Dr. Ritz was deliberately indifferent to that need.

to the referral request. Although Dr. Ritz testified that he did not conduct an "in-depth review" of the medical records in this case, this does not necessarily mean he was unaware of the recommendations by Barnes (Doc. 175-2, p. 18). Thus, when construing the facts in Montanez's favor, the Court finds that extent of Dr. Ritz's knowledge is a question of fact for the jury. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("Whether a prison official was subjectively aware of a risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . .").

Defendant Ritz further argues that that Judge Beatty erroneously utilized Dr. Ritz's testimony regarding his thought process for altering a referral in a different case to recommend denying Dr. Ritz's motion in this case. But it appears the purpose of Judge Beatty's reasoning was to point out the discrepancy relating to Dr. Ritz's role in the collegial review process. On the one hand, Dr. Ritz testified that his role "is not to . . . challenge or . . . modify the medical care provided to the patients that come to collegial . . . ." (Doc. 175-2. p. 18). On the other hand, Dr. Ritz testified that he has modified a request or suggested a different course of action in the past when he believes a referral request is not clinically appropriate (Doc. 175-2, p. 35-36). In light of this, Judge Beatty concluded that a jury could find that it was part of Dr. Ritz's role to modify Dr. Trost's initial referral request given that it was not clinically appropriate in light of Barnes's recommendation. The Court agrees with this conclusion. Thus, the Court denies summary judgment as to Dr. Ritz.

## II.    Wexford

Montanez again objects to Judge Beatty's factual statement that Dr. Couch "recommended a 'repeat of a CT scan of his orbits and return to discuss this further in the

future.'" (Doc. 207, p. 2). Montanez clarifies that the complete recommendation of Dr. Couch states as follows: "I have recommended repeat of a CT scan of his orbits and return to discuss this further in the *near* future." (Doc. 207, p. 2-3) (emphasis added). This objection is sustained, and the Court has incorporated the full statement in its factual findings set forth above.

Judge Beatty concluded that (1) evidence of Wexford's alleged policy condoning Dr. Trost's unexcused absences has no bearing on whether Dr. Trost's failure to follow Barnes's specific recommendation ultimately amounts to deliberate indifference, and (2) the alleged policy of hiring underqualified medical directors similarly has no bearing on whether Dr. Trost's failure to follow Barnes's specific recommendation amounts to deliberate indifference (Doc. 202, p. 10-12).

First, Montanez objects that Judge Beatty took an unnecessarily narrow view of Montanez's injury by relying only on the initial delay in failing to see a plastic surgeon and the failure to follow the instructions from Barnes. Montanez argues that his constitutional injury is much broader in that he also suffered a two-year delay before he was given the CT scan prescribed by Dr. Couch, and a four-year delay until he received corrective surgery on May 16, 2019. Second, Montanez objects that Judge Beatty failed to follow or acknowledge the controlling and analogous case of *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 920, 929 (7th Cir. 2004).

As to Montanez's first argument, in Judge Beatty's Report and Recommendation issued on March 29, 2019, he did in effect narrow the issues to "whether Dr. Trost acted with deliberate indifference when he failed to comply with Barnes' instructions that [Montanez]

return to Barnes' Plastic Surgery Clinic within one week for a follow-up exam and return to Barnes' Ophthalmology Clinic within two to three weeks." (Doc. 171, p. 8). He did not even discuss the other delays alleged by Montanez. As Wexford points out, Montanez (even while still represented by counsel) did not object to the Report and Recommendation in this regard, and the Court adopted it in its entirety.

Nonetheless, the Court finds the alleged constitutional violation here to be the failure to follow the Barnes's instructions, and the delay associated with such failure. That is because the Court of Appeals has recognized that that a jury "can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist," because "[i]nstructions from a specialist are evidence that the defendant knew a particular course of treatment was recommended by at least one other medical processional *at the time* the defendant chose not to provide that treatment." *Zaya*, 836 F.3d at 806 (emphasis in original).

The other delays that Montanez complains about do not support a claim of deliberate indifference when considering the totality of his care. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) ("We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serous medical needs."). "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). During these periods in which Montanez complains of specific delays in certain treatments, Montanez was provided pain medication and was being seen by various outside specialists related to his eye injury.

Additionally, as for the alleged delay relating to the CT scan prescribed by Dr. Couch, Montanez ended up receiving this CT scan on January 22, 2018, within two years after it was ordered. Dr. Couch explained in his deposition that he would expect this CT scan to occur more than a couple months or more than a year from the date it was prescribed, but not more than two years (Doc. 175-10, p. 12).

Moreover, as to the alleged delay relating to surgery, many outside medical professionals concluded that surgery was not warranted or did not recommend surgery at various points in time. For example, on March 17, 2016, Montanez saw Dr. Couch, and he did not recommend surgery during this examination (Doc. 175-3, p. 37). He explained at his deposition that "if you were to go in and try to fix every single fracture, in some cases you'd have the possibilities of causing worse issues, including double vision in primary gaze." (Doc. 175-10, p. 15). Montanez was also seen by another ophthalmologist, Dr. Natalie Azar, on December 13, 2017, and she did not initially recommend surgery at that time (Doc. 175-14, p. 5).

Thus, the Court ultimately agrees with Judge Beatty's conclusion that Montanez has failed to present evidence to support any type of causal link between the alleged policy and constitutional violation. This takes this case outside of *Woodward*, which found a "direct causal link" between the defendants' deviation from its established policy and the plaintiff's suicide. *Woodward*, 358 F.3d at 928. Here, a reasonable jury could not find that Wexford's alleged policy condoning Dr. Trost's unexcused absences or Wexford's alleged policy of hiring underqualified medical directors had a bearing on the failure to follow the specific recommendation from Barnes. As such, summary judgment is granted as to the policy and

practice claim.

C<span style="font-variant:small-caps">ONCLUSION</span>

For these reasons, the Court **ADOPTS** Magistrate Judge Beatty's Amended Report and Recommendation (Doc. 202), and **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment filed by Defendants Dr. Stephen Ritz and Wexford Health Sources, Inc. (Doc. 174). Wexford Health Sources, Inc. is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly at the conclusion of the entire action.

Jury Trial is will commence on **July 16, 2019, at 9:00 a.m**. A settlement conference has been scheduled to take place before Judge Beatty on **July 3, 2019, at 1:00 p.m.**

**IT IS SO ORDERED.**

**DATED:  June 20, 2019**


**s/ Nancy J. Rosenstengel_____**
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**